PAK HEINZ PLLC
Noah Heinz (Bar No. 368281)
Noah.Heinz@pakheinz.com
Albert Pak (Bar No. 361123)
Albert.Pak@pakheinz.com
20 F St. NW, 7th Floor
Washington, D.C. 20001
Telephone: (202) 505-6354

*Attorneys for Plaintiffs and all those similarly situated*

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Elena Bisquera, Jason Jones, and Chris Valencia, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MoneyLion Technologies, Inc., ML Plus, LLC, and MoneyLion of California LLC,<br><br>Defendants. | Case No: 5:26-cv-3296<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**INTRODUCTION** ........ **1**

**PARTIES** ........ **2**

A. PLAINTIFFS ........ 2

B. DEFENDANTS ........ 2

**JURISDICTION AND VENUE** ........ **4**

**FACTUAL ALLEGATIONS** ........ **6**

A. MONEYLION CHARGES HIGH FEES FOR ITS LOANS. ........ 6

B. THE FEES MONEYLION CHARGES ARE PART OF THE COST OF CREDIT. ........ 11

C. MONEYLION'S DISCLOSURE IS INACCURATE AND MISLEADING. ........ 15

D. MONEYLION CHARGES USURIOUS INTEREST. ........ 16

E. MONEYLION'S ADVERTISING AND BUSINESS PRACTICES ARE DECEPTIVE AND MISLEADING. ........ 17

F. PLAINTIFFS EXPERIENCED EACH CHALLENGED PRACTICE. ........ 18

**CLASS ALLEGATIONS** ........ **19**

**COUNT I** ........ **22**

**COUNT II** ........ **23**

**COUNT III** ........ **24**

**COUNT IV** ........ **26**

**COUNT V** ........ **27**

**COUNT VI** ........ **28**

**PRAYER FOR RELIEF** ........ **29**

**JURY DEMAND** ........ **30**

# CLASS ACTION COMPLAINT

Plaintiffs Elena Bisquera, Jason Jones, and Chris Valencia (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendants MoneyLion Technologies, Inc., ML Plus, LLC, and MoneyLion of California LLC (collectively, "MoneyLion" or "Defendants") and allege as follows:

## INTRODUCTION

1. MoneyLion markets itself as a consumer-friendly financial platform offering small-dollar loans and cash advances to financially vulnerable consumers. In reality, MoneyLion systematically imposes charges that function as interest while misrepresenting them as non-finance charges to obscure the true price of borrowing.

2. MoneyLion extends credit to consumers while also charging additional amounts labeled as "turbo fees," "tips," and "monthly membership fees." Although these charges are incident to, and in practice required for, obtaining credit on the timelines consumers need, MoneyLion does not classify them as "finance charges."

3. By excluding these charges from the finance charge and annual percentage rate (APR), MoneyLion understates the cost of credit in violation of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq*. It represents to consumers that its loans are "0% APR," misleading consumers into believing that the loans are cheap.

4. When properly characterized as finance charges, these fees dramatically increase the APR of MoneyLion's loans, pushing them beyond the maximum rates permitted under California law.

5. MoneyLion's business model is designed to evade lending regulations. It receives payment from customers in return for lending money, but characterizes the payments as something other than interest. In substance, these fees are simply the cost of credit.

6. MoneyLion's practices are also deceptive. By misrepresenting the nature and cost of its credit products, MoneyLion violates California's consumer protection statutes, including the Unfair Competition Law (UCL), False Advertising Law (FAL),

and Consumer Legal Remedies Act (CLRA), and California Financing Law (CFL).

7. To collect on its loans with ease, MoneyLion also requires consumers to preauthorize electronic bank transfers from their bank accounts for the repayment of their loans, in violation of the Electronic Fund Transfer Act, 15 U.S.C. § 1693k.

8. As a result of these practices, Plaintiffs and members of the Class paid more for credit than they were led to believe, entered into transactions they otherwise might not have agreed to, and were deprived of the ability to accurately compare credit options. Plaintiffs bring this action to obtain damages, restitution, and injunctive relief.

## PARTIES

### A. Plaintiffs

9. Plaintiff Elena Bisquera is a citizen of California, residing in Atascadero, California. Ms. Bisquera has paid thousands of dollars to MoneyLion over the past few years in connection with small-dollar loans and cash advances, including charges labeled "turbo fees," "tips," and membership fees.

10. Plaintiff Jason Jones is a citizen of California, residing in Corona, California. Mr. Jones has paid hundreds or thousands of dollars to MoneyLion over the past few years in connection with small-dollar loans and cash advances, including charges labeled "turbo fees," "tips," and membership fees.

11. Plaintiff Chris Valencia is a citizen of California, residing in Sugarloaf, California. Mr. Valencia has paid hundreds or thousands of dollars to MoneyLion over the past few years in connection with small-dollar loans and cash advances, including charges labeled "turbo fees," "tips," and membership fees.

### B. Defendants

12. Defendant MoneyLion Technologies Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. MoneyLion Technologies Inc. is a financial technology company that offers consumer financial products, including small-dollar loans, cash advances, and subscription-based financial services, through its mobile application and online

platform.

13. Defendant MoneyLion of California LLC ("MoneyLion California") is a limited liability company organized under the laws of the State of Delaware and authorized to do business in California. MoneyLion California is a subsidiary of MoneyLion Technologies Inc. and is responsible for originating, servicing, and facilitating consumer loans and advances to California residents.

14. Defendant ML Plus, LLC ("ML Plus") is a limited liability company organized under the laws of the State of Delaware and is a subsidiary of MoneyLion Technologies Inc. ML Plus offers subscription-based financial products and membership services through the MoneyLion platform, including services that provide consumers with access to financial tools, benefits, and credit-related features.

15. MoneyLion Technologies Inc. is the parent company of MoneyLion California and ML Plus and it owns, controls, and directs the operations of the MoneyLion platform, including the consumer financial products offered to users nationwide and in California.

16. MoneyLion Technologies Inc. managed, directed, controlled, and staffed ML Plus and MoneyLion California. ML Plus and MoneyLion California have no employees of their own. They rely on MoneyLion Technologies Inc. for staffing and management.

17. Defendants develop, operate, and maintain the MoneyLion platform, including the mobile application and associated services through which consumers obtain credit, cash advances, and related financial products.

18. Through the MoneyLion platform, Defendants market, advertise, and provide credit to consumers, including by offering expedited access to funds and related services in connection with the extension of credit.

19. In connection with these products, Defendants impose charges labeled as "turbo fees," "tips," and recurring membership fees, which are assessed in connection with consumers' access to credit.

20. Defendants jointly design, implement, and control the structure, pricing, and disclosures associated with their credit products, including the characterization of certain charges as non-finance charges and the exclusion of those charges from disclosed finance charges and APRs.

21. Defendants jointly draft, implement, and enforce the terms and conditions governing the use of the MoneyLion platform and its financial products, including provisions relating to fees, repayment, and dispute resolution.

22. Defendants acted in concert in designing, implementing, marketing, and maintaining their credit products and platform, including the representations and omissions concerning the true cost of credit and the nature of the charges imposed on consumers.

**JURISDICTION AND VENUE**

23. This case arises under the Truth in Lending Act, 15 U.S.C. § 1601 et seq., the Electronic Fund Transfer Act, 15 U.S.C. § 1693k, as well as California law, including Article XV, Section 1 of the California Constitution, the California Financing Law, Cal. Fin. Code § 22000 et seq., the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., the False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq., and the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.

24. This Court has subject matter jurisdiction over the action based on federal question jurisdiction under 28 U.S.C. § 1331 because the Truth in Lending Act and Electronic Fund Transfer Act create the causes of action alleged here.

25. This Court has supplemental subject matter jurisdiction over the California law claims under 28 U.S.C. § 1367 because they arise out of the same core nucleus of operative fact as the Truth in Lending Act claims.

26. This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because (1) there are more than 100 class members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) at least one member of the Class is a citizen of a

state different from at least one Defendant (specifically, all Plaintiffs are citizens of California, and MoneyLion Technologies Inc. is a citizen of New York and Delaware).

27. On information and belief, ML Plus LLC has one member, Diwakar Choubey who is a citizen of New York.

28. On information and belief, MoneyLion of California LLC has two members, MoneyLion Technologies Inc. and Adam VanWagner, who is a citizen of New York.

29. ML Plus LLC and MoneyLion California are therefore also citizens of New York and Delaware only, and the Court has diversity subject matter jurisdiction under 28 U.S.C. § 1332.

30. This Court has personal jurisdiction over MoneyLion Technologies Inc. because: (1) it conducts substantial business in California; (2) it develops, operates, and controls the MoneyLion platform through which consumer financial products are marketed and provided to California residents; and (3) it directs, controls, and participates in the design, marketing, and disclosure of the credit products at issue in this action, which were each advertised, agreed to, funded, and paid back in California by California residents.

31. This Court has personal jurisdiction over MoneyLion California because it provides, originates, and facilitates consumer loans to California residents, including those to Plaintiffs.

32. This Court has personal jurisdiction over Defendant ML Plus, LLC because: (1) it conducts business in California; (2) it participates in the development, operation, marketing, and/or servicing of the MoneyLion platform and related financial products; and (3) it directs, controls, and participates in the acts and practices alleged herein, which were advertised, agreed to, funded, and paid back in California by California residents.

33. Defendants have purposefully availed themselves of the privilege of conducting business in California by offering, marketing, and providing credit products

to California consumers and by deriving substantial revenue from such activities.

34. Venue is proper in the Central District of California because the Plaintiffs reside in this district, and therefore the conduct at issue occurred there.

## FACTUAL ALLEGATIONS

**A. MoneyLion Charges High Fees for Its Loans.**

35. Defendants operate a financial technology platform that offers a suite of consumer financial products, including small-dollar loans, cash advances, and subscription-based financial services, to consumers nationwide, including in California.

*a) InstaCash Loans*

36. MoneyLion advertises and offers a loan called “MoneyLion InstaCash.”

37. MoneyLion advertises and promotes InstaCash as an immediate source of funds for “[u]nexpected vet bills or a last-minute date night.”

38. Repayment is due within 14 days.

39. The MoneyLion mobile app describes the product as “0% APR cash advances up to $500, deposited in seconds.”




40. MoneyLion limits borrowers to $100 at a time, though it has allowed up to $1,000 to be borrowed via InstaCash.

41. To borrow, a consumer must link their bank account where they receive a regular paycheck from their job and preauthorize payment from that bank account.

42. MoneyLion runs a proprietary credit check to keep non-payment low, which includes verifying recurring payments from an employer or other income source, and ensuring the amounts of the regular payments are sufficiently high relative to the amount borrowed.

43. The preauthorized payment is timed to coincide with the recurring payments they have verified.

44. MoneyLion also checks spending history and borrowing history.

45. As a result, the risk of non-payment is lower than ordinary loans, and MoneyLion's collection rate is high despite working with a population that may have a poor conventional credit history.

46. InstaCash is, in other words, a form of a payday loan, tiding borrowers over for a few days until payday.

47. Though advertised as instant, 0% APR, and "deposited in seconds," MoneyLion actually charges a "turbo fee" of between $0.49 and $8.99 for InstaCash to be deposited. The size of the fee, much like interest, scales with the size of the loan.

48. Essentially all consumers pay the "turbo fee" when they borrow InstaCash. It is the default option on the interface.

49. The MoneyLion interface does not clearly show how to avoid paying it, but portrays it as part of the product. The "turbo fee" is automatically added to the total, with no separate consent required. A consumer would need to avoid pressing the "confirm" button, and instead search through a dropdown arrow next to the total "amount" listed to see the breakdown between the "turbo fee" and the principal.

50. If consumers do press into this dropdown and attempt to remove the "turbo fee," they are asked, "want your cash in minutes?" The brightly colored "Get cash now" confirmation re-adds the "turbo fee."

51. If they instead press "select another method," they then will learn that their money cannot be instant, in seconds, or in minutes, but instead will be deposited five days later.

52. Given the advertising, naming, purpose, and fourteen-day repayment period of InstaCash, few consumers are seeking it out for an expense five days in the future. Getting cash five days later is simply a different and inferior product that fails to live up to MoneyLion's claims and advertising for InstaCash.

53. The "turbo fee" is, in substance, a payment for the lending of money.

54. It does not cover MoneyLion's actual cost of any service. This is obvious because it scales up as the amount of the loan increases.

55. The "turbo fee" is charged for each transaction, which can add up to substantial amounts over time.

56. MoneyLion also demands a "tip" for InstaCash loans.

57. The "tip" does not go to a service worker or deliveryman, but simply pays MoneyLion to lend money.

58. The MoneyLion app is designed to induce consumers to pay the tip.

59. MoneyLion pre-populates a tip amount as a default, and this default is a percentage of the loan amount.

60. A consumer must notice this and change the amount to $0 to avoid paying the tip.

61. Even then, MoneyLion shows a follow-up screen, telling consumers "We're all in this together" and "Are you sure" and similar messages, with various tip options again pre-selected, with a "recommendation" of a tip amount.

62. After consumers decline to pay a tip, MoneyLion injects pop-ups into the app later on when a consumer tries to take another action, with guilt-inducing language such as "Looks like we didn't get a tip last time!" and "We could really use a tip for last time."

63. Other messages include that tipping "will help us ensure that we can keep offering the product" and: "it takes money to keep 0% APR InstaCash running, so please consider a tip to help keep it free"; and "tips are what help us cover the high costs of administering InstaCash at 0% APR for the large and growing MoneyLion community."

64. Many consumers reasonably believe that, in light of these pestering messages, there will be an adverse consequence if they fail to tip, such as incessant pop-ups, reduced functionality, reduced borrowing limits, or that the service will no longer be, as MoneyLion claims, "free."

65. MoneyLion iterates the messages and workflow to maximize the tips consumers pay, using variations on the wording, emphasis, timing, and other design features.

66. These efforts are successful. Virtually all borrowers pay "turbo fees," and a large percentage pay tips, even though the population of borrowers tends to be low-income and in difficult financial situations.

67. Because InstaCash must be repaid within 14 days (or sometimes less), the APR exceeds 100% once tips or "turbo fees" are included.

68. For example, a consumer who obtains a $100 InstaCash advance, pays an $8.99 "turbo fee," and pays a $10 "tip" pays $118.99 to obtain $100 in credit. If repaid within 14 days, those charges produce an APR of 495%.

69. The net result is that a consumer that tries to borrow $100 for a loan that purports to be 0% APR and delivered in seconds must ultimately pay $100 *plus* a "turbo fee" *plus* a tip, all of which were financed.

70. As noted above, MoneyLion verifies and links to a consumer's bank account as a pre-condition to lending under its InstaCash product. It requires that account to be the one into which paychecks are deposited, and requires consumers to preauthorize automatic payment from that account when a paycheck comes in.

71. The preauthorized amount that is paid by the linked bank account includes the principal, the turbo fee, and the tip—all are part of the loan, not separate transactions.

72. MoneyLion profits if consumers regularly take out the same small-dollar loans and pay the high fees, week-after-week.

*b) Credit Builder Loans*

73. Another financial product MoneyLion offers is called Credit Builder Loans, which are paid over multiple months.

74. Credit Builder loans are in the range of $300 to $1000 and claim to be at an APR which can range from 5.99% to 29.99%.

75. The loan terms range from 6 months to 24 months.

76. MoneyLion does not give consumers the full amount they borrowed. Rather, it keeps most of it in a "credit reserve account," which is available only *after* the consumer pays off the loan (and all fees). The effective amount borrowed is consequently lower than the principal amount MoneyLion claims.

77. For example, Plaintiff Bisquera took out a $899 Credit Builder Loan. Of that, only $100 was given to her. The other $799 was placed into a credit reserve account.

78. The disclosed interest was 23.91% APR, and the loan required her to pay $39.37 every other week (or about $79 per month).

79. This was to continue for 12 months, until Plaintiff Bisquera had paid $1,023.52 (recall, after receiving only $100) before the loan was considered paid off. After that point, she would get the remainder of the now-paid-off $799 loan. But these are not the only costs.

80. To borrow Credit Builder Loans, consumers must pay a "monthly membership fee," which has varied over time, but is in the range of $19.99 to $29.00. This fee is charged until the consumer pays off the loan in full.

81. Some loan documents claim that a customer can cancel their membership plan (and thus stop paying the fee), but in practice, consumers who try to do so are not able to stop paying the fee until and unless they pay off their existing balance. Thus, they keep getting charged month after month, falling deeper into debt.

82. The "monthly membership fee" is in substance a payment in return for the extension of a loan, but is not disclosed as such, and is not included in the APR.

83. Even at the lowest $20 "monthly membership fee" rate, the fee is a large proportion of the total payment. Plaintiff Bisquera received $100 and paid $79 per month *plus* (at minimum) a $20 fee—making the charge per month ($99) nearly equal to the amount she received ($100). If she paid according to the terms, she would ultimately pay $1,263 in total, of which $899 is the principal, $124.52 is the disclosed finance charge, and $240 is the monthly membership fee.

84. If characterized as a finance charge, the monthly membership fee changes the APR to 69%.

85. If, like many MoneyLion consumers, she was unable to pay, MoneyLion would eat into her credit reserve account to pay the interest and fees, driving her deeper into debt (on top of other penalties for late payments).

**B. The Fees MoneyLion Charges Are Part of the Cost of Credit.**

86. Congress enacted the Truth in Lending Act to ensure "a meaningful disclosure of credit terms" and to avoid "the uninformed use of credit." 15 U.S.C. § 1601(a).

87. Congress enacted TILA to address widespread consumer confusion regarding the true cost of credit to promote the informed use of credit through meaningful disclosure of credit terms.

88. TILA requires creditors to disclose any "finance charge," as well as the Annual Percentage Rate (APR), which reflects the total cost of credit on a standardized basis. *Id.* § 1638; *see also* 12 C.F.R. § 1026.17, 1026.18, 1026.22.

89. Under TILA, the "finance charge" is "the sum of all charges, [1] payable directly or indirectly by the person to whom the credit is extended, and [2] imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 1026.4(a) (same).

90. These requirements are intended to ensure that consumers can accurately understand and compare the cost of credit across different lenders and products. Recognizing that purpose, "courts are to focus on the economic substance of the transaction in determining whether TILA has been violated." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000); *see also Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (in applying TILA, courts "look[] past the form of the transactions to their economic substance").

91. Congress recognized that lenders may attempt to obscure the true cost of credit by relabeling or restructuring charges to make credit appear less expensive than it

actually is, and therefore required that all charges that function as the cost of credit be disclosed as finance charges and included in the APR.

92. MoneyLion imposes multiple types of charges on consumers in connection with its loans.

*a) Finance Charges in InstaCash Loans*

93. The "turbo fees" and "tips" consumers pay for InstaCash loans are finance charges.

94. First, there is no question that "turbo fees" and "tips" are "payable directly or indirectly by the person to whom the credit is extended." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 1026.4(a) (same). Both "turbo fees" and "tips" are "payable" *only* by the consumer—that is, the prospective borrower—and the consumer is the person to whom the credit is extended. No one else pays these fees, or even can.

95. Second, "turbo fees" and "tips" are "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 1026.4(a) (same).

96. MoneyLion is the "creditor." And MoneyLion receives the fees.

97. The fees are also incident to the extension of credit. "A charge need not be mandatory to be 'incident to the extension of credit' and thus constitute a 'finance charge' under TILA. All that is required is a connection between the imposition of the charge and the extension of credit. At the time TILA was enacted, Black's Law Dictionary defined 'incident' as 'anything which is usually connected with another, or connected for some purposes, though not inseparably.'" *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 937 (N.D. Cal. 2025) (quoting "Incident," Black's Law Dictionary (4th ed. 1968)).

98. The "turbo fee" and "tips" occur in the course of the same transaction in which a consumer applies for and receives a loan. They are even financed by the loan, becoming part of the amount to be paid at the end of the loan term.

99. There is a clear connection between the "turbo fee" and the loan—nearly

every consumer pays it when they get InstaCash and the loan cannot be used as advertised without it.

100. There is also a clear connection between "tips" and the loan—namely, the tip is *for the loan*, not for any separate thing.

101. Neither the "turbo fees" nor the "tips" would be paid absent the extension of credit.

*b) Finance Charges in Credit Builder Loans*

102. The "monthly membership fees" consumers pay for Credit Builder Loans are finance charges.

103. There is no question that "monthly membership fees" are "payable directly or indirectly by the person to whom the credit is extended." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 1026.4(a) (same). The "monthly membership fee" is "payable" *only* by the consumer—that is, the prospective borrower—and the consumer is the person to whom the credit is extended.

104. Second, "monthly membership fees" are "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 1026.4(a) (same).

105. MoneyLion is the "creditor."

106. MoneyLion receives the fees.

107. The fees are also incident to the extension of credit. "A charge need not be mandatory to be 'incident to the extension of credit' and thus constitute a 'finance charge' under TILA. All that is required is a connection between the imposition of the charge and the extension of credit. At the time TILA was enacted, Black's Law Dictionary defined 'incident' as 'anything which is usually connected with another, or connected for some purposes, though not inseparably.'" *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 937 (N.D. Cal. 2025) (quoting "Incident," Black's Law Dictionary (4th ed. 1968)).

108. The "monthly membership fees" are required for consumers to borrow

using a Credit Builder loan. They are paid in the course of the same transaction in which a consumer applies for and receives a loan.

109. There is a clear connection between the "monthly membership fee" and the loan, since every consumer pays it when they get a Credit Builder Loan.

110. MoneyLion may argue that they allow a consumer to stop paying the fee after a period of time, but consumers in practice have not been able to do this without paying off their loan balance. And even if some consumers did manage—perhaps by making a special request through customer service or unusually persistent complaining—to stop paying the fee at some point, the "monthly membership fees" they already paid would still be finance charges.

111. MoneyLion tries to obscure that a "monthly membership fee" is really just a finance charge by bundling other services into it, but these services are a sham because they have no independent value to MoneyLion customers.

112. MoneyLion claims that the "monthly membership fee" gives access to credit monitoring tools, but it offers those tools for free to all MoneyLion customers (even those not paying the "monthly membership fee" for credit builder loans).

113. MoneyLion claims to offer educational tools to consumers who pay a "monthly membership fee," but, again, these are available for no charge to other customers.

114. MoneyLion also claims to give access to InstaCash, but, again, this is also available without paying the "monthly membership fee" (and not really a benefit considering its high fees).

115. MoneyLion offers a "cashback" benefit, but the benefits are poor value and require spending substantial amounts of money, which customers borrowing from MoneyLion are in a poor position to do.

116. MoneyLion claims that the "monthly membership fee" will allow a consumer to open a checking or investment account without the administrative fee, but its fee schedule shows that the administrative fee is $0 anyway even without paying the

"monthly membership fee."

117. Credit Builder Loans are the *only* product MoneyLion offers that is unavailable without the "monthly membership fee." The reason Plaintiffs (and other consumers) paid the fee is to get Credit Builder Loans, not for any other supposed benefit.

**C. MoneyLion's Disclosure Is Inaccurate and Misleading.**

118. Each financial product MoneyLion offers includes multiple descriptions on the application or website, as well as a TILA disclosure in the loan documents. Those disclosures are inaccurate and misleading.

119. The InstaCash product purports to be "no interest" and "0% APR." But it is not.

120. Rather, the tips and "turbo fees" make it a high-interest loan.

121. MoneyLion failed to disclose the true APR and finance charge amounts.

122. The Credit Builder Loans similarly do not disclose the true APR and finance charges, because they do not count the monthly membership fee as part of the finance charge.

123. The Credit Builder Loans require a deposit to be placed into a "credit reserve account" which consumers cannot spend or access.

124. TILA requires a disclosure of how the deposit affects the APR: "If the creditor requires the consumer to maintain a deposit as a condition of the specific transaction, a statement that the annual percentage rate does not reflect the effect of the required deposit." 12 C.F.R. § 1026.18(r).

125. The Consumer Financial Protection Bureau has promulgated a "Required Deposit Model Clause" which states: "The annual percentage rate does not take into account your required deposit." *See* 12 C.F.R. pt. 1026, app. H, Model Clause H-7.

126. MoneyLion has no such disclosure.

127. MoneyLion understates the true cost of credit and misrepresents the price of their products to consumers.

**D. MoneyLion Charges Usurious Interest.**

128. California law bars usury in a variety of ways.

129. Article XV, Section 1 of the California Constitution limits the amount of interest that may be charged for the loan or forbearance of money and embodies a strong public policy against excessive and abusive lending practices.

130. To effectuate this policy, California law treats "interest" broadly to include any compensation for the use or forbearance of money, regardless of how such compensation is labeled, including through devices designed to evade usury limits. Cal. Const. Art. XV, § 1.

131. California's statutory framework governing lenders likewise prohibits form-over-substance efforts to evade limits on the cost of credit. The CFL regulates lenders and requires that charges imposed in connection with loans comply with statutory limitations, including in Cal. Fin. Code § 22303.

132. Section 22303 provides that lenders shall receive "charges at a rate not exceeding the sum of the following: (a) Two and one-half percent per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred twenty-five dollars ($225). (b) Two percent per month on that portion of the unpaid principal balance in excess of two hundred twenty-five dollars ($225) up to, including, but not in excess of nine hundred dollars ($900). (c) One and one-half percent per month on that part of the unpaid principal balance in excess of nine hundred dollars ($900) up to, including, but not in excess of one thousand six hundred fifty dollars ($1,650). (d) One percent per month on any remainder of such unpaid balance in excess of one thousand six hundred fifty dollars ($1,650)."

133. For this purpose, "'Charges' include the aggregate interest, fees, bonuses, commissions, brokerage, discounts, expenses, and other forms of costs charged, contracted for, or received by a licensee or any other person in connection with the investigating, arranging, negotiating, procuring, guaranteeing, making, servicing, collecting, and enforcing of a loan or forbearance of money, credit, goods, or things in

action, or any other service rendered." Cal. Fin. Code § 22200.

134. California law expressly provides that lenders may not circumvent interest limitations: "No person, except as authorized by this division, shall directly or indirectly charge, contract for, or receive any interest, discount, or consideration greater than the lender would be permitted by law to charge if he or she were not a licensee hereunder, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit. This section applies to any person, who by any device, subterfuge, or pretense charges, contracts for, or receives greater interest, consideration, or charges than is authorized by this division for any loan, use, or forbearance of money, goods, or things in action or for any loan, use, or sale of credit." Cal. Fin. Code § 22326.

135. Whatever usury limit applies, MoneyLion exceeded it routinely, once "tips," "monthly membership fees," and "turbo fees" are properly categorized as "charges."

136. California also has a provision prohibiting unconscionable terms in contracts, which applies to the interest rate as well. *See* Cal. Fin. Code § 22302; *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 976-77, 986 (2018).

137. These laws reflect a unified principle that lenders may not avoid disclosure obligations or rate limitations by dividing the cost of credit into multiple components or by labeling interest as fees.

138. Defendants' conduct falls within the concerns these laws were enacted to address, including the use of fee-based structures to obscure the true cost of credit and evade legal requirements.

**E. MoneyLion's Advertising and Business Practices Are Deceptive and Misleading.**

139. California's consumer protection statutes, such as the UCL, FAL, and CLRA, further prohibit businesses from misrepresenting or omitting material information about the cost of financial products.

140. Defendants market and advertise their products in a manner that suggests

they are low-cost or no-interest forms of credit.

141. The representations above concerning "tips" are misleading, since they misled consumers into paying the tips even though they provided no value. The representations made consumers reasonably think the tips were required or that not paying them would result in higher fees later or another penalty.

142. The representations concerning the "monthly membership fee" are misleading, since they suggest to the reader that the fee pays for various valuable services, but actually it does not.

143. MoneyLion represented that InstaCash has "no interest," is "lightning fast," and offers "0% APR cash advances up to $500, deposited in seconds."

144. MoneyLion represented various APRs and finance charge amounts in its loan agreements with respect to Credit Builder Loans, but those APRs did not include the "monthly membership fee," so they were materially wrong and misleading.

145. These representations are false and misleading because they fail to disclose the true cost of credit and the role of the various fees charged in connection with the loans.

146. Defendants' omissions and misrepresentations are material to reasonable consumers, who rely on Defendants' representations in deciding whether to obtain credit.

147. As a result of Defendants' conduct, Plaintiffs and members of the Class paid more for credit than they were led to believe.

148. Plaintiffs and Class members were deprived of the ability to make informed financial decisions and to compare credit products on an equal basis.

149. Plaintiffs and Class members suffered economic injury, including the payment of unlawful and improperly disclosed charges.

**F. Plaintiffs Experienced Each Challenged Practice.**

150. Plaintiffs each used InstaCash and Credit Builder Loans.

151. Plaintiffs each saw the advertisements and descriptions alleged in this

complaint and relied on them.

152. In particular, each Plaintiff saw representations that InstaCash was 0% APR, "no interest," included "lightning fast transfers," and the other representations in this complaint to the same effect.

153. MoneyLion did not disclose the true APR or finance charges with respect to the InstaCash and Credit Builder Loans Plaintiffs received.

154. MoneyLion did not include a disclosure regarding required deposits with the Credit Builder Loans Plaintiffs received.

155. Plaintiffs were not aware that the tips, "turbo fees," and monthly membership fees functioned as interest and significantly increased the true cost of borrowing.

156. They were trapped in a cycle of high-interest debt.

157. On April 22, 2026, Plaintiffs sent a CLRA class-action notice letter to MoneyLion via certified mail with return receipt requested.

## CLASS ALLEGATIONS

158. This action is properly maintainable as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

159. Common questions of law and fact predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

160. Plaintiffs seek certification of a Class consisting of the following individuals:

161. All persons residing in California who, during the applicable limitations period, obtained a loan, cash advance, or other extension of credit from MoneyLion and were charged fees, including but not limited to "turbo fees," "tips," or "monthly membership fees" in connection with such transactions.

162. Plaintiffs explicitly reserve the right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

163. The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, or directors; (3) employees, officers, and attorneys for Defendants, including Defendants' counsel, and non-attorney employees of their firms; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and (6) the legal representatives, successors, and assigns of any such excluded persons.

164. Defendants' practices violated each Class member's statutory and common law rights by misrepresenting the true cost of credit and by charging and failing to properly disclose finance charges in connection with consumer lending transactions.

165. Defendants' unlawful conduct has resulted in injury to members of the Class by causing them to obtain credit under misleading terms, including the misrepresentations and omission of the true cost of borrowing and the imposition of unlawful and undisclosed charges.

166. **Numerosity**. Defendants provide consumer financial products to a large number of individuals nationwide, including in California. During the relevant class period, Defendants extended credit to thousands, if not millions, of consumers and charged the fees described herein. The Class is therefore so numerous that joinder of all members is impracticable.

167. **Commonality**. The Class presents common questions of law and fact. These common questions include, but are not limited to: (1) whether Defendants charged fees that constitute "finance charges" under federal and state law; (2) whether Defendants failed to properly disclose finance charges and APRs; (3) whether Defendants' conduct resulted in the charging of unlawful or usurious interest; (4) whether Defendants' representations and omissions regarding the cost of credit were

misleading to reasonable consumers; (5) whether Defendants' conduct violated the Truth in Lending Act and California consumer protection statutes; (6) whether and in what amount damages, restitution, or other monetary relief are warranted; and (7) the amount of attorneys' fees, costs, interest, and other relief to be awarded.

168. **Predominance**. These common issues predominate over any individualized issues because Defendants' liability arises from uniform practices, including standardized fee structures, disclosures, and representations made through Defendants' platform, which were applied to all consumers in materially the same manner.

169. **Typicality**. Plaintiff's claims are typical of the claims that could be asserted by all members of the Class. Plaintiffs and the members of the Class were exposed to the same practices and omissions by Defendants and were injured in the same manner by Defendants' conduct.

170. **Adequacy**. Plaintiffs will adequately represent the interests of the Class because there are no conflicts between Plaintiffs and absent class members, and because Plaintiff's counsel has the experience and skill to zealously advocate for the interests of the Class.

171. **Superiority**. There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the alleged conduct; and because issues common to members of the Class can be most effectively managed in a single proceeding.

172. Plaintiffs reserves the right to revise the foregoing allegations based on facts learned through additional investigation and in discovery.

**COUNT I**

**Violation of the Truth in Lending Act**

**15 U.S.C. § 1601 et seq.**

173. The allegations of Paragraphs 1 through 171 are re-alleged as if fully set forth herein.

174. Plaintiffs, on behalf of the Class, bring this claim against Defendants under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.

175. TILA was enacted to promote the informed use of credit by requiring "meaningful disclosure of credit terms," including the accurate disclosure of finance charges and APRs. 15 U.S.C. § 1601(a).

176. Defendants are "creditors" within the meaning of TILA because they regularly extend consumer credit. 15 U.S.C. § 1602(g).

177. Plaintiffs and members of the Class are "consumers" within the meaning of TILA because they are natural persons to whom credit was extended for personal, family, or household purposes. 15 U.S.C. § 1602(i).

178. TILA requires creditors to accurately disclose the "finance charges," which includes any charge imposed directly or indirectly by the creditor as an incident to or a condition of the extension of the credit. 15 U.S.C. § 1605(a).

179. TILA further requires creditors to accurately disclose the APR, which must reflect the true cost of credit. 15 U.S.C. § 1632(a); *id.* § 1638(a)(4).

180. Defendants imposed charges on Plaintiffs and Class members in connection with the extension of credit, including but not limited to "turbo fees," "tips," and "monthly membership fees."

181. These charges constitute finance charges under TILA because they are imposed as an incident to, or as a condition of, the extension of credit.

182. Despite this, Defendants failed to include these charges in the disclosed finance charge and failed to incorporate them into the disclosed APR.

183. As a result, Defendants' APRs and finance charges materially understated

the true cost of credit.

184. Defendants' disclosures were therefore inaccurate, misleading, and in violation of TILA.

185. For InstaCash, it appears that MoneyLion failed to provide a standardized TILA disclosure *at all*, which implicates additional sections of TILA that require various terms to be included.

186. Defendants' violations of TILA were knowing and part of a uniform practice applied to Plaintiffs and members of the Class.

187. As a result of Defendants' violations, Plaintiffs and members of the Class are entitled to statutory damages, actual damages, costs, injunctive relief, and attorneys' fees pursuant to 15 U.S.C. § 1640.

**COUNT II**

**Violation of the Electronic Fund Transfer Act**

**15 U.S.C. § 1693k**

188. The allegations of Paragraphs 1 through 186 are re-alleged as if fully set forth herein.

189. The Electronic Fund Transfer Act states: "No person may (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k; *see also* 12 C.F.R. § 1005.10(e) (same); 12 C.F.R. § 1005.2(k).

190. Consumers have a private right of action to enforce the EFTA. *See* 15 U.S.C. § 1693m.

191. To receive InstaCash, MoneyLion requires consumers to link a bank account. MoneyLion then verifies recurring payments to that bank account, and notes the timing of when the payments are made. MoneyLion requires customers to preauthorize payment from that account to cover the loan on the day when a payment will be made to the account (usually a paycheck).

192. This is not incidental—rather, it is a core part of MoneyLion's credit check

process.

193. Customers cannot apply for an InstaCash loan through the MoneyLion app without preauthorizing payment from their bank. The same button that completes a consumer's InstaCash application also states—in the fine print at the bottom—that by agreeing, the consumer authorizes MoneyLion to pay from the linked bank account.

194. Preauthorizing an electronic fund transfer is therefore a "condition of the extension of credit" for InstaCash, violating the EFTA.

195. On MoneyLion's account settings, the user supposedly can withdraw authorization, but that is illusory since the interface does not allow a consumer to revoke their bank account as a payment method without providing another.

196. The Credit Builder Loan likewise requires preauthorization.

197. As with InstaCash, on MoneyLion's interface applying for the loan constitutes agreement to pay using the consumer's linked account.

198. There is no way to apply for a Credit Builder Loan without also agreeing to the payment authorization.

199. Preauthorizing an electronic fund transfer is therefore a "condition of the extension of credit" for Credit Builder Loans, violating EFTA.

**COUNT III**

**Violation of California Usury Law**

**Cal. Const. art. XV, § 1; Cal. Civ. Code § 1916-2; Cal. Fin. Code § 22303**

200. The allegations of Paragraphs 1 through 198 are re-alleged as if fully set forth herein.

201. Plaintiffs, on behalf of the Class, bring this claim for usury against Defendants under California law.

202. Article XV, Section 1 of the California Constitution, Cal. Civ. Code § 1916-2, and Cal. Fin. Code § 22303 each limit the rate of interest that may be charged on consumer loans.

203. Under California law, "interest" includes any compensation paid for the

use, forbearance, or detention of money, regardless of how such compensation is labeled.

204. Section 22303 provides that lenders shall receive "charges at a rate not exceeding the sum of the following: (a) Two and one-half percent per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred twenty-five dollars ($225). (b) Two percent per month on that portion of the unpaid principal balance in excess of two hundred twenty-five dollars ($225) up to, including, but not in excess of nine hundred dollars ($900). (c) One and one-half percent per month on that part of the unpaid principal balance in excess of nine hundred dollars ($900) up to, including, but not in excess of one thousand six hundred fifty dollars ($1,650). (d) One percent per month on any remainder of such unpaid balance in excess of one thousand six hundred fifty dollars ($1,650).

205. For this purpose, "'Charges' include the aggregate interest, fees, bonuses, commissions, brokerage, discounts, expenses, and other forms of costs charged, contracted for, or received by a licensee or any other person in connection with the investigating, arranging, negotiating, procuring, guaranteeing, making, servicing, collecting, and enforcing of a loan or forbearance of money, credit, goods, or things in action, or any other service rendered." Cal. Fin. Code § 22200.

206. California law expressly provides that lenders may not circumvent interest limitations: "No person, except as authorized by this division, shall directly or indirectly charge, contract for, or receive any interest, discount, or consideration greater than the lender would be permitted by law to charge if he or she were not a licensee hereunder, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit. This section applies to any person, who by any device, subterfuge, or pretense charges, contracts for, or receives greater interest, consideration, or charges than is authorized by this division for any loan, use, or forbearance of money, goods, or things in action or for any loan, use, or sale of credit." Cal. Fin. Code § 22326.

207. Defendants charged Plaintiffs and members of the Class amounts in connection with credit transactions, including conventional interest, as well as "turbo

fees," "tips," and "monthly membership fees."

208. These charges constitute compensation for the use or forbearance of money and therefore constitute interest under California law.

209. Defendants imposed these charges directly or indirectly as part of the credit transaction and as a condition of obtaining funds.

210. Defendants structured these charges as purportedly "optional" or ancillary fees in an effort to evade characterization as interest and to avoid the application of California's usury limits.

211. California law renders a loan contract void, disallowing the lender from even recovering the principal, if the lender willfully violates usury law. Cal. Fin. Code § 22750.

212. When these charges are properly characterized as interest, the total interest charged exceeds the maximum rates permitted.

**COUNT IV**

**Violation of California False Advertising Law**

**Cal. Bus. & Prof. Code § 17500 et seq.**

213. The allegations of Paragraphs 1 through 212 are re-alleged as if fully set forth herein.

214. Plaintiffs bring this claim under the False Advertising Law ("FAL"), which makes it unlawful to disseminate any statement concerning services that is untrue or misleading. Cal. Bus. & Prof. Code § 17500.

215. Defendants made and disseminated statements to the public concerning the cost and nature of their credit products.

216. These statements were untrue and misleading because they omitted material information regarding finance charges and the true cost of credit. Cal. Bus. & Prof. Code § 17500.

217. Defendants knew, or by the exercise of reasonable care should have known, that these statements were misleading. Cal. Bus. & Prof. Code § 17500.

218. Members of the public, including Plaintiffs, were likely to be deceived by these statements. Cal. Bus. & Prof. Code § 17500.

219. Plaintiffs suffered injury in fact and lost money as a result of Defendants' conduct. Cal. Bus. & Prof. Code § 17535.

220. Plaintiffs seek restitution and injunctive relief as authorized by Cal. Bus. & Prof. Code § 17535.

**COUNT V**

**Violation of California Consumer Legal Remedies Act**

**Cal. Civ. Code § 1750 et seq.**

221. The allegations of Paragraphs 1 through 220 are re-alleged as if fully set forth herein.

222. Plaintiffs bring this claim under the Consumer Legal Remedies Act ("CLRA"), which prohibits unfair methods of competition and unfair or deceptive acts or practices. Cal. Civ. Code § 1770(a).

223. Plaintiffs and members of the Class are "consumers." Cal. Civ. Code § 1761(d).

224. Defendants' services constitute "services." Cal. Civ. Code § 1761(b).

225. The transactions at issue are "transactions" intended to result in the sale of services to consumers. Cal. Civ. Code § 1761(e).

226. Defendants violated Cal. Civ. Code § 1770(a)(5) by representing that their credit products have characteristics or benefits that they do not have, including misrepresenting the true cost of credit.

227. Defendants violated Cal. Civ. Code § 1770(a)(9) by advertising services with the intent not to sell them as advertised, including by advertising low-cost credit while charging undisclosed finance charges.

228. Defendants violated Cal. Civ. Code § 1770(a)(14) by representing that transactions confer rights or obligations that they do not have, including by misrepresenting the nature and cost of the credit provided.

229. Defendants violated the CLRA by "[i]nserting an unconscionable provision in the contract." Cal. Civ. Code § 1770(a)(19). Multiple provisions of MoneyLion's contracts are unconscionable, including its arbitration agreement.

230. Plaintiffs seek injunctive relief, damages, and other relief as authorized by Cal. Civ. Code § 1780(a).

231. On April 22, 2026, a CLRA demand letter was sent to Defendants' addresses via certified mail that provided notice of Defendants' violation of the CLRA and demanded that Defendants correct the unlawful, unfair, false and deception practices alleged here. The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated."

**COUNT VI**

**Violation of California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 et seq.**

232. The allegations of Paragraphs 1 through 231 are re-alleged as if fully set forth herein.

233. Plaintiffs, on behalf of the Class, bring this claim against Defendants under California's Unfair Competition Law ("UCL"), which prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

234. Defendants' conduct constitutes unlawful business acts because it violates TILA, the EFTA, California's usury law, the CLRA, and the FAL, as set forth above.

235. Defendants' conduct (including its misleading disclosures) constitutes unfair business practices because it offends established public policy and is immoral, unethical, oppressive, and substantially injurious to consumers. Cal. Bus. & Prof. Code § 17200.

236. Defendants' conduct constitutes fraudulent business acts because it is likely to deceive members of the public. Cal. Bus. & Prof. Code § 17200.

237. Plaintiffs and members of the Class lost money or property as a result of Defendants' conduct. Cal. Bus. & Prof. Code § 17204.

238. Plaintiffs seek restitution and injunctive relief, as authorized by Cal. Bus. & Prof. Code § 17203.

239. The remedies available under the UCL are cumulative to remedies under other laws. Cal. Bus. & Prof. Code § 17205.

## PRAYER FOR RELIEF

240. WHEREFORE, Plaintiffs, on behalf of the proposed Class, pray for judgment against Defendants and respectfully request that the Court grant the following relief:

241. Award actual damages to Plaintiffs and members of the Class, including all amounts paid in connection with Defendants' unlawful credit products, including but not limited to improperly charged "turbo fees," "tips," "membership fees," and other undisclosed finance charges;

242. Award statutory damages to Plaintiffs and members of the Class pursuant to the Truth in Lending Act, 15 U.S.C. § 1640(a), and any other applicable statutes;

243. Award restitution and disgorgement of all revenues, profits, or other financial benefits that Defendants obtained as a result of their unlawful, unfair, and deceptive conduct, including under Cal. Bus. & Prof. Code §§ 17203 and 17535;

244. Award actual damages and statutory damages to Plaintiffs and members of the Class for Defendants' violations of the Electronic Fund Transfer Act, including 15 U.S.C. § 1693k and Regulation E, under 15 U.S.C. § 1693m(a);

245. Award damages, restitution, and any other relief available under the Consumer Legal Remedies Act, Cal. Civ. Code § 1780(a);

246. Award pre-judgment and post-judgment interest on all amounts awarded, including at the maximum rate permitted by law;

247. Award reasonable attorneys' fees and costs incurred in prosecuting this action, including under 15 U.S.C. § 1640(a)(3), Cal. Civ. Code § 1780(e), 15 U.S.C. § 1693m(a)(3), Cal. Code Civ. Proc. § 1021.5, and other applicable law;

248. Grant declaratory relief that Defendants' conduct violates federal and

California law;

249. Grant injunctive relief requiring Defendants to accurately disclose all finance charges and the true annual percentage rate of their credit products, cease mischaracterizing charges as optional or non-finance charges, and cease engaging in the unlawful, unfair, and deceptive practices alleged herein;

250. Award restitution and any other appropriate relief for Defendants' violations of California usury law and the California Financing Law;

251. Award such other and further relief as the Court deems just and proper.

**JURY DEMAND**

252. Plaintiffs demand a trial by jury.

Dated: June 15, 2026

Respectfully submitted,

*/s/ Noah Heinz*

Noah Heinz

PAK HEINZ PLLC
Noah Heinz (Bar No. 368281)
Noah.Heinz@pakheinz.com
Albert Pak (Bar No. 361123)
Albert.Pak@pakheinz.com
20 F St. NW, 7th Floor
Washington, D.C. 20001
Telephone: (202) 505-6354

*Attorneys for Plaintiffs and all those similarly situated*