PAK HEINZ PLLC
Noah Heinz (Bar No. 368281)
Noah.Heinz@pakheinz.com
Albert Pak (Bar No. 361123)
Albert.Pak@pakheinz.com
20 F St. NW, 7th Floor
Washington, D.C. 20001
Telephone: (202) 505-6354

*Attorneys for Plaintiffs and all those similarly situated*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION–RIVERSIDE**

Elena Bisquera, et al.,

Plaintiffs,

vs.

MoneyLion Technologies, Inc., et al.,

Defendants.

Case No. 5:26-cv-03296-SSS-E

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AS TO PLAINTIFFS ELENA BISQUERA AND JASON JONES**

Hearing date: October 23, 2026
Time: 2:00 p.m.
Judge: Hon. Sunshine S. Sykes
Courtroom: 2 (via Zoom)

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 1

ARGUMENT .......... 2

I. No Agreement to Arbitrate Was Formed. .......... 3

A. California law governs whether the parties formed a contract. .......... 3

B. MoneyLion failed to provide reasonably conspicuous notice of the arbitration provision. .......... 3

C. Plaintiffs did not unambiguously assent to the arbitration provision. .......... 6

II. If A Contract Was Formed, California Law Controls Enforceability. .......... 7

A. Section 1799.208 voids the New York choice-of-law clause. .......... 8

B. The CLRA's non-waiver provision bars enforcement of the clause. .......... 8

C. New York law cannot displace California's fundamental lending policies. .......... 8

III. The Arbitration Clause Is Not Enforceable. .......... 9

A. The Agreement Is Procedurally Unconscionable. .......... 10

1. The Agreement is a contract of adhesion. .......... 10

2. The Agreement is oppressive and surprising. .......... 10

3. MoneyLion's opt-out does not defeat unconscionability. .......... 11

B. The Agreement Is Substantively Unconscionable. .......... 12

1. The staged arbitration provisions delay adjudication and lack mutuality. .......... 12

2. Section 7's $50,000 appeal threshold inordinately benefits MoneyLion. .......... 15

3. The Informal Dispute Resolution Procedure is substantively unconscionable because it is one-sided. .......... 15

4. The fee-shifting provision is unconscionable. .......... 17

5. The Agreement's overbroad confidentiality provision is unconscionable. .......... 19

6. The Agreement's arbitrable-claims provision violates California Civil Code section 1670.15. .......... 20

7. The New York choice-of-law provision is also substantively unconscionable. ........ 21

C. The Unconscionable Provisions Cannot Be Severed. ........ 21

IV. Demand for Attorney's Fees ........ 22

**CONCLUSION** ........ 22

**L.R. 11-6.2 CERTIFICATE OF COMPLIANCE** ........ 23

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*America Online, Inc. v. Superior Court*,
90 Cal. App. 4th 1 (2001)....8, 21

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) .... 10, 14-18, 22

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022).... 3-6

*Betancourt v. Transportation Brokerage Specialists, Inc.*,
62 Cal. App. 5th 552 (2021)....11

*Brack v. Omni Loan Co.*,
164 Cal. App. 4th 1312 (2008)....9

*Carbajal v. CWPSC, Inc.*,
245 Cal. App. 4th 227 (2016)....17, 18

*Cluck v. GEO Secure Servs., LLC*,
122 Cal. App. 5th 249 (2026)....12

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ....9

*Flores v. Transam. Homefirst, Inc.*,
93 Cal. App. 4th 846 (2001)....11

*Godun v. JustAnswer, LLC*,
135 F.4th 699 (9th Cir. 2025)....4

*Gostev v. Skillz Platform, Inc.*,
88 Cal. App. 5th 1035 (2023)....19

*Graham v. Scissor-Tail, Inc.*,
28 Cal. 3d 807 (1981)....10

*Gurganus v. IGS Solutions LLC*,
115 Cal. App. 5th 327 (2025)....20

*Gustin v. Club Demonstration Servs., Inc.*, No. 1:25-cv-00579, 2026 WL 1948873 (E.D. Cal. July 6, 2026) ........ 13, 22

*Haydon v. Elegance at Dublin*, 97 Cal. App. 5th 1280 (2023) ........ 19, 20

*Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670 (9th Cir. 2024) ........ 10-13, 17

*Holl v. U.S. Dist. Court*, 925 F.3d 1076 (9th Cir. 2019) ........ 3

*Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005 (9th Cir. 2024) ........ 4

*Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816 (2010) ........ 22

*Lim v. TForce Logistics, LLC*, 8 F.4th 992 (9th Cir. 2021) ........ 18, 19

*Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064 (2003) ........ 15

*MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022) ........ 12, 13, 17

*McKeown v. SAS Retail Servs., LLC*, No. 25-03654, 2025 WL 3563717 (N.D. Cal. Dec. 12, 2025) ........ 13, 14

*Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) ........ 9, 12

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992) ........ 9

*Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013) ........ 19

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ........ 3, 4

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023)....................................................................3, 4, 6

*O'Malley v. Williams-Sonoma, Inc.*,
No. 26-cv-01276, 2026 WL 2640697 (N.D. Cal. Sep. 8, 2026) ........................13

*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) .....................................................................10, 17

*Pandolfi v. AviaGames, Inc.*,
No. 23-cv-05971, 2024 WL 4051754 (N.D. Cal. Sep. 4, 2024) ..................13, 14

*Pandolfi v. AviaGames, Inc.*,
No. 24-5817, 2025 WL 2463742 (9th Cir. Aug. 27, 2025)...............................13

*Patterson v. ITT Cons. Fin. Corp.*,
14 Cal. App. 4th 1659 (1993)..........................................................................11

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010)..........................................................................20

*Ramirez v. Charter Commc'ns, Inc.*,
16 Cal. 5th 478 (2024) ........................................................................14, 16, 19

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) ..........................................................................................9

*Rios v. HRB Digital LLC*,
807 F. Supp. 3d 975 (N.D. Cal. 2025) ..................................................12, 13, 17

*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024)........................................................................22

*Ruiz v. Moss Bros. Auto Grp., Inc.*,
232 Cal. App. 4th 836 (2014)...........................................................................7

*Sanchez v. Valencia Holding Co., LLC*,
61 Cal. 4th 899 (2015) ..................................................................................14

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021)............................................................................4

*Swain v. LaserAway Med. Grp., Inc.*,
57 Cal. App. 5th 59 (2020) ........ 11

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) ........ 19

*Trivedi v. Curexo Tech. Corp.*,
189 Cal. App. 4th 387 (2010) ........ 18

*Wash. Mut. Bank, FA v. Superior Court*,
24 Cal. 4th 906 (2001) ........ 9

**Statutes**

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ........ 9

Cal. Civ. Code § 1670.15 ........ 21

Cal. Civ. Code § 1670.15(b) ........ 21

Cal. Civ. Code § 1670.5(a) ........ 22

Cal. Civ. Code § 1751 ........ 8, 14, 21

Cal. Civ. Code § 1799.207 ........ 8

Cal. Civ. Code § 1799.208 ........ 8, 23

Cal. Civ. Code § 1799.208(a)(2) ........ 8

Cal. Civ. Code § 1799.208(b) ........ 8

Cal. Civ. Code § 1799.208(c) ........ 23

Cal. Civ. Code § 1799.208(e) ........ 8

Cal. Civ. Code § 1916-2 ........ 9

Cal. Const. art. XV, § 1 ........ 9

Cal. Fin. Code § 22303 ........ 9

9 U.S.C. § 2 ........ 9

**Other Authorities**

Thomas J. Umberg, *Restoring Fairness to California's Arbitration Laws—Governor Newsom Signs Umberg's SB 82*, Cal. State Senate (Oct. 7, 2025), https://sd34.senate.ca.gov/news/restoring-fairness-californias-arbitration-laws-governor-newsom-signs-umbergs-sb-82 ........ 21

## INTRODUCTION

After violating California and federal lending law, MoneyLion seeks to shunt all claims to an unfair arbitration process of its own design. The Motion should be denied because the arbitration agreement is not enforceable. First, no arbitration agreement was formed because MoneyLion's consent flow is not sufficiently conspicuous. Second, even if an agreement was formed, the arbitration agreement is unconscionable. Procedurally, the agreement is a contract of adhesion, imposed with no opportunity to negotiate, and with oppressive and surprising terms. Substantively, the agreement includes multiple unfair terms, including a waiver of California consumer protections, a staged, batched arbitration process that delays adjudication, a one-sided appellate option, and an overbroad arbitrable-claims provision.

## BACKGROUND

Plaintiffs are California residents who borrowed money through MoneyLion's mobile application. Dkt._13-1 at 9-10. To create a MoneyLion account, users fill in information and click "Create account." *Id.* Below "Create account," MoneyLion displays in small text (with hyperlinks in the *same* color as the surrounding text): "By creating an account, I accept the Electronic Transaction Esign Consent, Arbitration & Waivers Agreement, Privacy Policy and Terms and Conditions." Dkt._13-5.

The arbitration Agreement includes detailed and arduous pre-arbitration procedures (§3), batch-arbitration rules for mass claims (§4), and provisions addressing remedies, appeals, confidentiality, fees and costs, and a New York choice-of-law provision. *See generally* Dkt._13-1; Dkt._13-4 at 12. Consumers have 30 days to opt-out by mailing MoneyLion a personally signed notice. Dkt._13-4 at 6.

Section 3 describes a mandatory "Informal Dispute Resolution Procedure." Dkt._13-4 at 4. Claimants must submit personal contact information and a description of their claim and must personally participate in an individualized settlement conference. Dkt._13.4 at 5, 8-9. Counsel may not complete these requirements for claimants. *Id.* If a claimant commences arbitration before *full* compliance with the Informal Dispute

Resolution Procedure or without the certification required by Section 4(c), he must pay MoneyLion's attorney's fees and costs. Dkt._13-4 at 9-10.

Section 4 establishes procedures for "Mass Filings." Under those procedures, an initial group of 50 claims proceeds. Dkt._13-4 at 9-11. Other claims may not even be filed. *Id.* The Agreement gives MoneyLion the power to elect whether the Mass Filings procedure applies. Dkt._13-4 at 9. After *all* 50 separate arbitrations end, everyone must participate in a global mediation. *Id.* Then, a second group of 100 claims proceeds. Once *all* 100 arbitrations end, there is another mediation, and then a third group of 200 claims proceeds. *Id.* After that, claimants may opt-out of further arbitration by *each* personally sending (not through an attorney) individually signed notices. Dkt._13-4 at 10. MoneyLion also can opt any claimant out of arbitration. *Id.* If neither side opt-outs, the arbitrations proceed with at most 200 separate arbitrations at one time, and mediation in between batches. A subsequent group cannot be filed until the preceding group of 200 claims has been "adjudicated, settled, withdrawn, or otherwise resolved." *Id.* The batches proceed in sequence, not concurrently. *See* Dkt._13-4 at 9-11.

The Agreement limits available remedies. Dkt._13-4 at 6-8. Section 4(c) provides that, *"[e]xcept in the case of mass or coordinated arbitrations*, the arbitrator can award on an individual basis the same damages and relief that a court can award." Dkt._13-4 at 7 (emphasis added). The Agreement establishes a right to appeal for awards exceeding $50,000, Dkt._13-4 at 11-12, defines "Claim" expansively, *id.* at 3-4, and contains a strict confidentiality provision, *id.* at 12-13. Finally, the Agreement also reserves remedies for MoneyLion outside the arbitration process, including rights to terminate or suspend accounts, liquidate loan collateral, and pursue other contractual "self-help" remedies. Dkt._13-4 at 4, 11-12.

## ARGUMENT

The Motion should be denied because no agreement was formed. Alternatively, if an agreement was formed, California law applies, and under California law the arbitration clause is unconscionable.

# I. No Agreement to Arbitrate Was Formed.

## A. California law governs whether the parties formed a contract.

Federal courts apply state-law principles of contract formation to determine whether the parties agreed to arbitrate. *See Holl v. U.S. Dist. Court*, 925 F.3d 1076, 1083 (9th Cir. 2019). Here, Plaintiffs are California residents, accessed MoneyLion's application from California and filed suit in California. MoneyLion identifies no other state with a comparable interest in determining whether California consumers formed an agreement to arbitrate. California law therefore governs the question of contract formation, which precedes consideration of any choice-of-law clause.

## B. MoneyLion failed to provide reasonably conspicuous notice of the arbitration provision.

Under the Ninth Circuit's standard, Plaintiffs never agreed to arbitrate. Contracts are enforceable only if (1) the website provides "reasonably conspicuous notice" of the terms to which the consumer will be bound, and (2) the consumer takes some action that "unambiguously manifests assent" to those terms. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014). MoneyLion's account creation screen fails both steps. Because MoneyLion's screen requires no separate checkbox, but does place hyperlinks on the same page, Dkt._13-5, it must be judged under an objective-reasonableness standard considering the totality of the circumstances. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513-14 (9th Cir. 2023). Those circumstances include scrutinizing the contract's form and presentation, nature and size, completeness and prominence, and the interface's design and content.

Courts have repeatedly refused to enforce arbitration provisions like MoneyLion's that have fine print, no color contrast for hyperlinks, and a confirmation button that says nothing about the agreement. *Berman* is instructive. There, the disclosure was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements," and the larger text "naturally directs the user's attention everywhere else,"

making the notice "the antithesis of conspicuous." *Berman*, 30 F.4th at 856-57. Based on those defects, users "never entered into a binding agreement to arbitrate." *Id.* at 853. In *Sellers v. JustAnswer LLC*, the court likewise faulted a disclosure in small print below the action button, whose hyperlink was underlined, but had no color-contrast. 73 Cal. App. 5th 444, 465-66, 477-81 (2021). The Ninth Circuit has explained that "[s]imply underscoring ... will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Berman*, 30 F.4th at 857. The design elements used to identify a hyperlink are relevant to whether contractual terms are reasonably conspicuous. *Godun v. JustAnswer, LLC*, 135 F.4th 699, 709-10 (9th Cir. 2025).

MoneyLion's screen fails this test, as the image below demonstrates. Below the "Create account" button, in text smaller than every other element on the page, appears a sentence: "By creating an account, I accept the Electronic Transaction Esign Consent, Arbitration & Waivers Agreements, Privacy Policy and Terms and Conditions." Dkt._13-5. Unlike *Oberstein*'s bright blue hyperlink set apart from the surrounding text, *Oberstein*, 60 F.4th at 515-16, the links here are only underlined in the *same* color as the rest of the sentence—no cue distinguishes "Arbitration & Waivers Agreements" from the surrounding text or the three other hyperlinked documents in the same sentence. Unlike the "Sign in" button in *Oberstein*, which sat directly beneath language explicitly tying the click to agreement, MoneyLion's "Create account" button says nothing about agreement at all. Many consumers doubtless missed the fine print and had no idea that clicking "Create account" would bind them to multiple contracts. The small print is even harder to read here because it is on a small mobile phone screen.




*Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 861 (9th Cir. 2022), Arbitration Provision Notice




MoneyLion Arbitration Provision Notice

As to Bisquera, MoneyLion identifies three purported instances of assent to the arbitration agreement: (1) her October 14, 2025 account creation; (2) her October 15, 2025 Credit Builder Plus Membership Agreement when she clicked "Looks good" after

being presented with the "Repayment schedule" screen; and (3) her October 15, 2025 Pledge and Security Agreement, which incorporated the Agreement for Resolving Disputes by reference. Dkts._13-5 to -8. The first screen was discussed above. Second, the "Looks good" button on the Credit Builder Plus screen says nothing about arbitration, and the disclosure states that Bisquera agrees to the "Credit Builder Plus terms," without prominently identifying the arbitration provision. Dkt._13-9. Third, the Pledge and Security Agreement cannot cure either defect because it states that Bisquera had "already agreed" to the Disputes Agreement and incorporates that agreement by reference *without even providing a hyperlink*. Dkt._13-10.

The same is true for Jones. MoneyLion identifies two purported instances of assent: (1) his June 7, 2024, acceptance of the updated Agreement for Resolving Disputes when he clicked "Agree" on the screen shown in Exhibit E; and (2) his January 9, 2025, Pledge and Security Agreement which incorporated the Agreement for Resolving Disputes by reference. Dkts._13-6, 13-7, 13-11. The June 2024 screen does not contain the features that made the agreement enforceable in *Oberstein*. Although the screen states that clicking "Agree" constitutes acceptance of the Agreement for Resolving Disputes, the arbitration provision itself was not separately or prominently identified, and the agreement was presented through a small hyperlink. Dkt._13-7; *Oberstein*, 60 F.4th at 515-16. Jones's later Pledge and Security Agreement, like Bisquera's, merely states that Jones had "already agreed" to the Disputes Agreement and incorporates it by reference (without providing a link). Dkt._13-11. No conspicuous notice was ever provided.

**C. Plaintiffs did not unambiguously assent to the arbitration provision.**

MoneyLion also cannot establish unambiguous manifestation of assent. *Berman*, 30 F.4th at 856. Lobo asserts that Jones "clicked 'Agree'" on the June 7, 2024, screen, but supplies no audit trail, transaction record, clickstream data, or other contemporaneous system evidence. Lobo Decl. ¶ 18; Dkt._13-7. Nor does Exhibit E establish that Jones clicked "Agree"—at most, it depicts what MoneyLion says was

presented to him (which included "Skip for now" as an option).

The same deficiency applies to the account creation screen. Lobo states that Bisquera selected "Create account," but MoneyLion provides no contemporaneous electronic record establishing that she did so *or* that the displayed screen is even what she saw. Ex._C. A party seeking to enforce an electronic agreement must do more than simply assert that the consumer assented. *Ruiz v. Moss Bros. Auto Group, Inc.*, 232 Cal. App. 4th 836, 842-46 (2014). Exhibit C purports to depict Bisquera's account-creation screen, but the screen says "Create account," while Lobo describes the button as "Create free account." Lobo Decl. ¶¶ 15-16. The exhibit also refers to "Arbitration & Waivers Agreements," while the document MoneyLion identifies is titled "Agreement for Resolving Disputes." Dkts._13-4, 13-5.

The other exhibits are plainly *not* what any Plaintiff saw. Exhibit G is a design mock-up that *no* borrower saw, containing a "[Name]" placeholder, a March 30, 2024, repayment date, "Bank of America 1234," and internal design instructions such as "Animated from 0%" and "DEV NOTE." Dkt._13-9. Lobo's assertion that she is "personally familiar" with MoneyLion's systems does not supply the missing evidence where, as her declaration establishes, she began working for MoneyLion after the purported assent. Lobo Decl. ¶¶ 1, 11, 15, 16. She is relying on documents, but the documents simply do not establish unambiguous consent.

The same evidentiary issues extend to the loan agreements. The Pledge and Security Agreements state that Plaintiffs "already agreed" to the Disputes Agreement, but MoneyLion provides no electronic signature history, audit trail, or system evidence establishing how those electronic signatures were generated or attributing them to Plaintiffs. Dkt._13-1 at 11, 12. MoneyLion also does not show that the incorporated Disputes Agreement was actually linked or accessible to Plaintiffs.

## II. If A Contract Was Formed, California Law Controls Enforceability.

California law governs whether the Arbitration Agreement is enforceable notwithstanding its New York choice-of-law clause for three independent reasons.

### A. Section 1799.208 voids the New York choice-of-law clause.

First, California Civil Code § 1799.208(a)(2) provides that a seller may not require a consumer "to arbitrate a controversy arising in California under the substantive law of a state other than California." Provisions that do so are "voidable by the consumer," and once voided, "the matter shall be adjudicated in California and California law shall govern the dispute." Cal. Civ. Code § 1799.208(b). Here, the Arbitration Agreement requires claims that undisputedly arose in California to arbitrate under New York law. Lobo Decl., Dkt._13-4 at 11. Plaintiffs now request that the Court declare the provision void. Notably, any "waiver" of section 1799.208 "is contrary to public policy, and is void and unenforceable." Cal. Civ. Code § 1799.207. The provision applies to "a contract entered into, modified, or extended on or after January 1, 2025." Cal. Civ. Code § 1799.208(e). Jones's 2024 Agreement for Resolving Disputes predates the statute's effective date, but the Pledge and Security Agreement on January 9, 2025 is after the cutoff, and expressly re-incorporated the Disputes Agreement "as if fully set forth herein." Lobo Decl. ¶ 25; Dkt._13-11. The Pledge and Security Agreement "entered into" or "extended" the arbitration and choice-of-law terms within the meaning of § 1799.208(e).

### B. The CLRA's non-waiver provision bars enforcement of the clause.

Second, the CLRA provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ. Code § 1751. "Enforcement of … choice of law clauses would be the functional equivalent of a contractual waiver of the consumer protections under the CLRA and, thus, is prohibited under California law." *America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 5 (2001). Here, if New York law governed, Plaintiffs' CLRA claim would disappear. Section 1751 does not permit that result.

### C. New York law cannot displace California's fundamental lending policies.

California's choice-of-law rules independently defeat the New York clause.

California applies *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466 (1992), and *Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 916-18 (2001). Under that framework, a court asks whether the chosen state has a substantial relationship to the parties or the transaction, or whether there is some other reasonable basis for the choice. *Nedlloyd Lines B.V.*, 3 Cal. 4th at 466. If so, the court asks whether applying the chosen state's law would be contrary to a fundamental policy of California. *Id.* If it would, the court asks whether California has a materially greater interest than the chosen state in the issue. *Id.* If California's interest is materially greater, the chosen law is not enforced. *Id.*

Applying that standard, Plaintiffs are California residents, the Instacash and Credit Builder products were accessed and used in California, and Plaintiffs' claims implicate California's usury, licensing, and advertising statutes. Cal. Const. art. XV, § 1; Cal. Civ. Code § 1916-2; Cal. Fin. Code § 22303; Cal. Bus. & Prof. Code §§ 17500 *et seq*. This is the "fundamental" consumer-lending policy *Brack v. Omni Loan Co.* held cannot be displaced by a choice-of-law clause. 164 Cal. App. 4th 1312, 1327 (2008). New York's only connection to the transaction is MoneyLion's principal place of business—it has no comparable interest in shielding a lender from California's regulatory scheme for loans made to California residents.

**III. The Arbitration Clause Is Not Enforceable.**

The Court should deny the Motion because the Agreement is unconscionable. The Federal Arbitration Act makes arbitration clauses "valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). Here, the California contract defense of unconscionability is just such a ground. Often, arbitration clauses include a delegation clause assigning the question of unconscionability to the arbitrator. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-72 (2010). Defendants cite many such cases. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208-09 (9th Cir. 2016) (extensive dispute over Uber's delegation clause); *First Options*, 514 U.S. at 944-45 (addressing

delegation). But here, the Agreement contains a *non*delegation clause: "only a court can decide the following: Issues relating to the scope and enforceability of the arbitration provision described in this Agreement." Dkt._13-4 at 7. That makes this case easier from the typical motion to compel arbitration.

**A. The Agreement Is Procedurally Unconscionable.**

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125 (2019). Unconscionability has procedural and substantive components: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). Contracts of adhesion are automatically procedurally unconscionable to some degree, and further procedural unconscionability turns on oppression and surprise. *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 681 (9th Cir. 2024).

**1. The Agreement is a contract of adhesion.**

Procedural unconscionability "begins with an inquiry into whether the contract is one of adhesion." *OTO*, 8 Cal. 5th at 126. That "term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817 (1981). Here, MoneyLion drafted the Agreement, held all the bargaining power, and gave Plaintiffs no meaningful opportunity to negotiate its terms. *See* Lobo Decl. ¶¶ 15-18. That "in itself" demonstrates procedural unconscionability. *Heckman*, 120 F.4th at 681.

**2. The Agreement is oppressive and surprising.**

This Agreement is both surprising and oppressive because MoneyLion presented Plaintiffs with a non-negotiable contract that buried material terms limiting Plaintiffs' rights, including provisions waiving California consumer protections. "Oppression

arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," while surprise "can arise when 'the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'" *Heckman*, 120 F.4th at 682 (quoting *Flores v. Transam. HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001), and *Patterson v. ITT Cons. Fin. Corp.*, 14 Cal. App. 4th 1659, 1664 (1993)).

As an example of surprise, MoneyLion represented that the updated "Agreement for Resolving Disputes" was revised to be "more specific about the procedures for resolving disputes relating to your use of the MoneyLion platform." Dkt._13-7. But the updated Agreement added *substantive* (and unfavorable) provisions governing Mass Filings and sequential batching that impose severe burdens on consumers. *See* Dkt._13-4 at 8-10. This is far from making the agreement "more specific," and MoneyLion's description lulled consumers into a false security. *Id.* The update was also adhesive. The screen presented users with an "Agree" and "Skip for now" option, but MoneyLion treated "Skip for now" as constituting consent if the user continued using MoneyLion's services. Dkt._13-7.

Besides that, MoneyLion buried, deep inside the Agreement, a choice-of-law clause designed to displace California's consumer protections. Clause 8 provides that the Agreement is "governed by the laws of the State of New York." Dkt._13-4 at 11, 12. Again, this would be surprising to the typical Californian. The batch arbitration, discussed below in more detail, is also oppressive and surprising, since it means claims could take many years even to be filed.

**3. MoneyLion's opt-out does not defeat unconscionability.**

California precedent is clear that "an opt out provision does not insulate an arbitration agreement from a finding of procedural unconscionability." *Swain v. LaserAway Med. Grp., Inc.*, 57 Cal. App. 5th 59, 69 (2020), *as modified* (Nov. 3, 2020); *see also Betancourt v. Transportation Brokerage Specialists, Inc.*, 62 Cal. App. 5th 552, 561 (2021). Years ago, the Ninth Circuit stated in passing that "an arbitration agreement

is not adhesive if there is an opportunity to opt out of it," but that rule has never been unconditional and turns on the quality of the opt-out actually afforded, not merely its existence. *Mohamed*, 848 F.3d at 1211.

This case is like *Cluck v. GEO Secure Services, LLC*, where the court held that the opt-out was so "cumbersome that it did not meaningfully mitigate the procedural unconscionability" because it did not include "a check box allowing him to simply opt out" but instead required the plaintiff to "draft an opt out 'statement,' and mail or fax the statement to Florida, all within the first 30 days," which is almost exactly the same cumbersome requirements that applied here. 122 Cal. App. 5th 249, 254 (2026). Where an "opt-out is buried within a lengthy, dense agreement and imposes ongoing burdens, including the requirement that consumers submit a new opt-out request" for "successive versions of the arbitration agreement," it does not cure the procedural unconscionability. *Rios v. HRB Digital LLC*, 807 F. Supp. 3d 975, 986 (N.D. Cal. 2025). MoneyLion's opt-out provision appears only within the body of an eleven-page Agreement and does not allow a quick, electronic opt-out, but rather requires cumbersome physical mailing and a personal signature.

**B. The Agreement Is Substantively Unconscionable.**

The Agreement is substantively unconscionable for multiple independent reasons.

**1. The staged arbitration provisions delay adjudication and lack mutuality.**

The body of law addressing mass arbitration protocols has evolved consistent rules prohibiting the sequential mass-claims protocol at issue here. Start with *Heckman*, where the Ninth Circuit held a mass-arbitration protocol substantively unconscionable. 120 F.4th 670, 683-87 (9th Cir. 2024). The protocol there involved "bellwether" proceedings, which were unconscionable because later claimants would be unduly affected by earlier proceedings over which they had no say. *Id.* at 684. Next, consider the mass of cases addressing "a cap on the number of arbitrations ... that may proceed at one time." *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024, 1040-42 (N.D.

Cal. 2022). *MacClelland* teaches that allowing many claims proceed *concurrently* before different arbitrators poses less risk of unconscionable delay, but provisions forcing claims to proceed *in sequence* creates unconscionable delay. Courts have consistently embraced this logic. *See Rios*, 807 F. Supp. 3d at 990 (sequential batch process was unconscionable); *Pandolfi v. AviaGames, Inc.*, 2024 WL 4051754, at *6-12 (N.D. Cal. Sep. 4, 2024) (sequential bellwether provision creates delay that "likely has a chilling effect"), *aff'd*, 2025 WL 2463742 (9th Cir. Aug. 27, 2025); *McKeown v. SAS Retail Services, LLC*, 2025 WL 3563717, at *8 (N.D. Cal. Dec. 12, 2025) ("There is simply no adequate justification for forcing someone in Plaintiff's position to wait an indefinite amount of time for other people's claims to be resolved."); *Gustin v. Club Demonstration Servs., Inc.*, 2026 WL 1948873, at *8 (E.D. Cal. July 6, 2026) (invalidated a bellwether provision that forced claimants to wait for earlier arbitrations to conclude); *O'Malley v. Williams-Sonoma, Inc.*, 2026 WL 2640697, at *5 (N.D. Cal. Sep. 8, 2026) (holding unconscionable a sequential mass arbitration protocol).

The mass filing protocol here falls afoul of this case law. Here, as in *Heckman*, the Mass Filing provision subjects most claimants to a process and outcomes they had no say in. 120 F.4th at 684. Every unselected claimant's dispute is treated as not filed, while claims selected without their participation move forward. Dkt._13-4 at 9. Those unselected claimants wait for an indefinite period, potentially years, whole others' cases determine the outcome of their own. *Heckman*, 120 F.4th at 683-87.

As in *MacClelland* and the many cases following it, the protocol (1) limits the number of arbitrations that can proceed at one time, and (2) requires everyone else to proceed in sequence. Dkt._13-4 at 10. This is the sequential structure that *MacClelland*, *Pandolfi*, and a chorus of other precedents condemn. 609 F. Supp. 3d at 1040-42; 2024 WL 4051754, at *6-12. It "sets a cap on the number of arbitrations . . . that may proceed at one time" and provides no mechanism for relief when delay occurs. *MacClelland*, 609 F. Supp. 3d at 1040. A claimant in a later batch depends on the pace of other claimants, arbitrators, and MoneyLion in resolving unrelated disputes. *Rios*, 807 F.

Supp. 3d at 990. As in *Pandolfi*, that prospect "likely has a chilling effect on [claimants], deterring them from vindicating their rights." 2024 WL 4051754, at *6. As *McKeown* put it, there is "simply no adequate justification" for making someone wait indefinitely for other people's claims. 2025 WL 3563717, at *8.

Worse, MoneyLion alone controls whether staged arbitration happens. The California Supreme Court treats "any asymmetries between the parties" as a relevant factor. *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 506 (2024). A term favoring the stronger party is permissible only where a legitimate business justification for the asymmetry is explained in the contract or independently established. *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911-12 (2015). The Mass Filing provision fails that standard. Only MoneyLion holds the right to "elect" whether Mass Filings proceed through staged arbitration. Dkt._13-4 at 9. While claimants must decide whether to opt out within 30 days, MoneyLion receives 14 additional days after that window closes to observe which claimants opted out before deciding whether to opt out others. *Id.* That is an advantage available only to the drafter, and the Agreement offers no legitimate business justification for it. *See Sanchez*, 61 Cal. 4th at 911-12.

The cumulative effect is that MoneyLion has the unilateral right to (1) invoke the mass filing protocol, delaying all claims, and then, if it does not like how the arbitrations have been going (after years of arbitrations), it can (2) unilaterally "opt your Claim out of arbitration," sending it to court. Dkt._13-4 at 10. In essence, MoneyLion has maximum flexibility to sit on claims for years, then send them back to court.

Section 4(c) promises that the arbitrator "can award on an individual basis the same damages and relief that a court can award," "[e]xcept in the case of mass or coordinated arbitrations." Dkt._13-4 at 6-8. The claimants who are actually subjected to batching therefore receive inferior remedies. An arbitration agreement may not limit statutorily imposed remedies. *Armendariz*, 24 Cal. 4th at 103-04. The CLRA, on which Plaintiffs rely, makes any waiver of its protection "contrary to public policy" and "unenforceable and void." Cal. Civ. Code § 1751. A provision that guarantees full relief

in one-off arbitrations but withholds it in the mass proceedings the drafter designed is an inferior forum. It also imposes the harshest terms on the claimants least able to bear them. *See Armendariz*, 24 Cal. 4th at 114 (terms "overly harsh" or "one-sided" are substantively unconscionable).

**2. Section 7's $50,000 appeal threshold inordinately benefits MoneyLion.**

An arbitration term must possess at least a "modicum of bilaterality" and cannot be structured so the process functions as "an inferior forum that works to the [drafting party's] advantage." *Armendariz*, 24 Cal. 4th at 124. The California Supreme Court applied this principle to a $50,000 appeal threshold in *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064 (2003). There, the agreement permitted "either party" to seek review of any award exceeding $50,000. *Id.* at 1071. The Court held the provision unconscionable because it was "geared toward giving the arbitral defendant a substantial opportunity to overturn a sizable arbitration award," *id.* at 1074, and because "although parties may justify an asymmetrical arbitration agreement when there is a 'legitimate commercial need,' . . . there is no such justification for the $50,000 threshold." *Id.* at 1073 (citing *Armendariz*, 24 Cal. 4th at 117). Section 7 of the Agreement imposes a $50,000 appeal threshold. *See id.*; Dkt._13, Dkt._13-4 at 11-12. This provision is one-sided because MoneyLion will essentially never arbitrate *its own claims* against a borrower, and even less rarely will it seek $50,000 from judgment-proof payday loan borrowers. By contrast, consumers often have fee-shifting (or statutory, treble, and punitive damages), and so many awards would exceed $50,000, especially considering "injunctive relief costing more than $50,000." Dkt._13-4 at 11. Section 7 affords MoneyLion a realistic opportunity to seek review of sizable adverse awards, while giving up nothing. *Little*, 29 Cal. 4th at 1073. There is no legitimate commercial justification. *Id.*

**3. The Informal Dispute Resolution Procedure is substantively unconscionable because it is one-sided.**

Section 3 imposes a mandatory, lengthy procedure that a claimant must complete before arbitrations can be filed. Dkt._13-4 at 4-5. Courts scrutinize pre-arbitration

procedural hurdles because a facially neutral condition precedent may, in practice, impose a disproportionate burden on the weaker party. *Armendariz*, 24 Cal. 4th at 117; *Ramirez*, 16 Cal. 5th at 506.

Section 3 requires the claimant to contact customer service, and then to submit a written Notice of Dispute containing the claimant's name, address, email, phone number, the last four digits of the claimant's Social Security number, date of birth, a description of the claim, and an explanation of the specific relief sought and the basis for its calculation. Dkt._13-4 at 4. The Notice "must be personally signed" by the claimant, and submitted by him, not his counsel. *Id.* The claimant must then wait 45 days, participate *personally* in an individualized settlement conference if MoneyLion requests one, and wait an additional seven days after giving final notice before arbitration may even commence. *Id.* at 4-5. Compliance with every one of these steps is "a condition precedent to initiating arbitration," and "[i]f any aspect of the . . . Procedure has not been met, a court can enjoin the filing or prosecution of an arbitration." *Id.* at 5.

This structure is quite burdensome, and asymmetric. First, the process is individualized by design: "multiple parties initiating Claims (even if the Claims are related to raise similar issues and are brought by the same or coordinated counsel) cannot participate in the same Informal Settlement Conference." *Id.* at 4. That restriction falls only on claimants, since MoneyLion is never the one aggregated with similarly situated parties seeking efficiency. Second, the Notice of Dispute cannot be prepared or sent by an attorney on the claimant's behalf, meaning an unsophisticated consumer must personally compile sensitive personal information, calculate damages, and comply with a technical, multi-step process, while MoneyLion faces no comparable obstacle in complying with its own obligations under the same section. *Id.* Third, the consequence for imperfect compliance falls exclusively on claimants: MoneyLion, as the drafter, controls the form, and as the far more frequent user of this exact procedure, is far better positioned than any individual consumer to comply with its own technical requirements.

*See Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 244 (2016) (procedural unconscionability heightened where the drafting party never explains or offers to explain its own detailed requirements to the weaker party); *Rios*, 807 F. Supp. 3d at 990; *MacClelland*, 609 F. Supp. 3d at 1040-42.

MoneyLion makes the process individualized precisely where individualization is hard on claimants (the Notice and Informal Settlement Conference stage), and batched precisely where batching is hard on claimants (the arbitration stage itself, discussed above). A company that wanted a genuinely neutral pre-filing procedure would not flip the aggregation rules depending on which stage benefits it. That reversal is itself evidence that Section 3 "impos[es] unfair costs or risks" on claimants rather than offering "an effective means to pursue claims." *OTO*, 8 Cal. 5th at 133-134.

MoneyLion reserves unilateral self-help remedies outside the Agreement's dispute-resolution process entirely. The Agreement reserves MoneyLion's right to terminate or suspend a customer's account, liquidate loan collateral, report the customer to credit reporting agencies, and pursue "any self-help remedy," all without any obligation to first satisfy Section 3's Informal Dispute Resolution Procedure or seek relief in arbitration at all. This provision reveals asymmetry because MoneyLion built an elaborate, technical, individualized procedure that claimants must complete before seeking relief, while reserving for itself the ability to resolve its own disputes with customers unilaterally. A dispute-resolution scheme that the drafting party has no real need or intention to use is the clearest evidence that the scheme was designed to burden only the other side. *Cf. Heckman*, 120 F.4th at 683-87 (provisions "overly harsh" and "one-sided" where the process functioned to the drafter's advantage); *Armendariz*, 24 Cal. 4th at 117.

**4. The fee-shifting provision is unconscionable.**

The fee-shifting penalty for noncompliance with Section 3 is independently unconscionable. A party that "commence[s] an arbitration before fully satisfying the Informal Dispute Resolution Procedure" or files "without the certification required

under section 4(c)" "must pay the other party's arbitration-related fees and costs, including attorneys' fees." Dkt._13-4 at 8. This is in substance asymmetric, because borrowers will almost always be claimants. Moreover, consumers are entitled to one-way fee shifting if they prevail.

The provision is asymmetric. California law treats a fee-shifting provision in an arbitration agreement as a hallmark of substantive unconscionability because it imposes on a claimant "expense[s] that [the claimant] would not be required to bear if he or she were free to bring the action in court." *Armendariz*, 24 Cal. 4th at 110-11; *see Trivedi v. Curexo Tech. Corp.*, 189 Cal. App. 4th 387, 394-95 (2010) (fee-shifting clause requiring a mandatory award to the prevailing party, rather than an asymmetric standard protecting the weaker party, is substantively unconscionable); *Carbajal*, 245 Cal. App. 4th 227, 250-52 (2016) (provision waiving a party's statutory right to recover fees was substantively unconscionable). The Ninth Circuit's decision in *Lim v. TForce Logistics, LLC*, confirms that a fee-shifting provision is independently unconscionable when it attaches to a threshold, non-merits issue. 8 F.4th 992, 1002 (9th Cir. 2021). There, the arbitration agreement awarded attorney's fees to the prevailing party on the "gateway issue of arbitrability." *Id.* at 1000, 1003. The court held that this fee-shifting provision created an "unconscionable chilling effect" on the plaintiff's willingness to litigate even the threshold question, exposing him to attorney's fees "if his claims are unsuccessful." *Id.* at 1004-1005. Also, "the timing of the payment does not eliminate the unconscionable chilling effect of the fee-shifting provision," and a claimant's "ability to pay" is irrelevant. *Id.*

Here, MoneyLion's fee-shifting provision attaches to whether the claimant "fully satisf[ied]" the Informal Dispute Resolution Procedure or included the section 4(c) certification. Dkt._13-4 at 8. Given the Notice of Dispute's technical requirements, including precise personal information, a specific damages calculation, personal signature, proper mailing, and no assistance from counsel, the risk of an inadvertent, non-substantive misstep triggering fee liability falls overwhelmingly on unsophisticated

individual claimants, not MoneyLion, which drafted the procedure knows precisely what its requirements are, and in all likelihood will never use it. As in *Lim*, the chilling effect endures even though most claimants can avoid paying fees by perfect compliance. 8 F.4th at 1004-05.

MoneyLion may rely on *Tompkins v. 23andMe, Inc.*, but the case is inapposite. 840 F.3d 1016 (9th Cir. 2016). There, the Ninth Circuit applied California law, treating "bilateral" fee-shifting as enforceable, but not "unilateral" fee-shifting. *Id.* at 1024-26. That is no longer the law in California, if it ever was. As *Ramirez* explained, even bilateral fee-shifting provisions with respect to enforcing an agreement (the exact facts here) are unconscionable if the default rule for the underlying claim would be asymmetric fee-shifting. 16 Cal. 5th 478, 508 (2024). Here, the Truth in Lending Act and CLRA claims at minimum have fee-shifting in *only* the Plaintiff's favor. Replacing that asymmetric rule with this nominally symmetric rule is therefore unconscionable. *See Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 725 (N.D. Cal. 2012) *aff'd* 549 F. App'x 692, 694 (9th Cir. 2013) (applying this rule); *Gostev v. Skillz Platform, Inc.*, 88 Cal. App. 5th 1035, 1061 (2023) (quoting *Newton*).

**5. The Agreement's overbroad confidentiality provision is unconscionable.**

MoneyLion's confidentiality provision, Section 11 of the Agreement, is substantively unconscionable. Section 11 provides: "You and MoneyLion agree to keep confidential all aspects of the arbitration, any confidential information produced in the arbitration, and any arbitration award or decision." Dkt._13-4 at 12. The only stated exception permits disclosure "to the extent needed to pursue the arbitration or to appeal or confirm any award." *Id.* A confidentiality provision that categorically bars a claimant from disclosing the existence, content, or results of an arbitration is substantively unconscionable under California law. *Haydon v. Elegance at Dublin*, 97 Cal. App. 5th 1280, 1290 (2023).

In *Haydon*, the court held that a confidentiality clause prohibiting the parties from

"disclos[ing] the existence, content, or results of the arbitration" was substantively unconscionable, because such secrecy "restrict[s] the plaintiff from gathering information informally, increasing his or her costs unnecessarily," and defeats the purpose of arbitration as an efficient forum. *Id.* The Court of Appeal reached the same conclusion in *Gurganus v. IGS Solutions LLC*, holding that a provision barring disclosure of "any information to any other party not involved in the arbitration" without written approval would prevent a claimant from informally contacting or interviewing any prospective witness, including sharing information about their own claims, unless done through formal discovery. 115 Cal. App. 5th 327, 338-39 (2025).

Section 11's bar on "all aspects of the arbitration" is overbroad and functionally indistinguishable from *Haydon*. *See Haydon*, 97 Cal. App. 5th at 1290. It reaches not only the "existence, content, or results" of any proceeding but every "aspect" of it, plus separately-named categories covering any confidential information produced and any award itself. Dkt._13-4 at 12. Nothing in Section 11 *permits* a claimant to discuss their own arbitration with a prospective witness, compare experience with another claimant, or share their dispute publicly. The only carve-out is for steps "needed to pursue arbitration" itself, which may well be narrow. *Id.*

The provision is especially unfair for mass arbitrations. Section 4(h) contemplates that many claimants may bring related claims against MoneyLion. Dkt._13-4 at 8-9. MoneyLion necessarily knows the claims, arguments, and outcomes in every arbitration, while Section 11 bars claimants from learning similar information from other consumers.

**6. The Agreement's arbitrable-claims provision violates California Civil Code section 1670.15.**

The Agreement's definition of "Claim" reaches disputes "based on any constitution, statute, regulation, ordinance, common law rule (including rules relating to contracts, torts, negligence, fraud or other intentional wrongs) and equity," and further extending to claims "based in contract; tort; fraud; misrepresentation; negligence;

equity; or any constitutional, statutory, regulatory, or common law legal theory." Dkt._13-1 at 7, 15 (quoting Dkt._13-4 at 2-3, 5). This captures every conceivable legal theory across every field of law and any set of facts.

California Civil Code section 1670.15 provides: "[d]ispute resolution terms and conditions of a consumer use agreement shall be limited to the use, payment, or provision of the good, service, money, or credit provided by that consumer use agreement." Cal. Civ. Code § 1670.15(b). The Legislature enacted Senate Bill 82 to curb the "infinite" arbitration clauses that sweep in claims having no relationship to the contract itself. Thomas J. Umberg, *Restoring Fairness to California's Arbitration Laws*, Cal. State Senate (Oct. 7, 2025), https://sd34.senate.ca.gov/news/restoring-fairness-californias-arbitration-laws-governor-newsom-signs-umbergs-sb-82. This Agreement is an "infinite" arbitration clause and violates section 1670.15.

**7. The New York choice-of-law provision is also substantively unconscionable.**

For the same reasons set forth above, the New York choice-of-law provision is substantively unconscionable. It deprives Plaintiffs of California consumer protections that form the basis of their claims, while providing no reciprocal benefit. *See America Online*, 90 Cal. App. 4th at 5. The California legislature made the protections of the CLRA non-waivable. Cal. Civ. Code § 1751. However, the CLRA is a California law, and it would have no application if New York law governed. Enforcing a foreign choice-of-law clause that would strip California consumers of CLRA protections "would be the functional equivalent of a contractual waiver" of those protections, which California law prohibits. 90 Cal. App. 4th at 5.

**C. The Unconscionable Provisions Cannot Be Severed.**

California law provides that, if a court rules "any clause of the contract to have been unconscionable," it "may refuse to enforce the contract." Cal. Civ. Code § 1670.5(a). California courts "refuse to enforce an entire agreement if the agreement is 'permeated' by unconscionability," meaning "it 'contains more than one unlawful

provision," since "'multiple defects indicate a systematic effort to impose arbitration ... not simply as an alternative to litigation, but as an inferior forum that works to the [stronger party's] advantage." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 826 (2010) (quoting *Armendariz*, 24 Cal. 4th at 124) (alterations in original). Here, MoneyLion piled unconscionable clause upon unconscionable clause, taking every advantage for itself, including no less than *seven* separate unconscionable provisions.

The mass filing protocol by itself precludes severance. Courts confronting mass-arbitration and bellwether provisions like the one at issue here have applied that rule and declined severance. *See Gustin*, 2026 WL 1948873, at *14. Courts have "usually refused to sever unconscionable bellwether arbitration procedures from the remainder of an arbitration agreement." *Id*. The Mass Filing and sequential batching provisions here are the operative mechanism governing how and whether claims proceed, not just severable add-ons. The staged selection process, asymmetric opt-out and election rights, and the 200-claim sequential batching structure come together to form a scheme for controlling the overall pace and scope of adjudication. Severing them would not leave a functional arbitration agreement behind—it would require the Court to rewrite the parties' bargain instead of enforcing it. *See Armendariz*, 24 Cal. 4th at 124-25; *Ronderos v.USF Reddaway, Inc.*, 114 F.4th 1080, 1099-100.

**IV. Demand for Attorney's Fees**

Plaintiffs request an award of attorneys' fees for enforcing their rights under Cal. Civ. Code § 1799.208, pursuant to subsection (c).

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel, counsel of record for Plaintiffs, certifies that this brief contains 6,849 words, which complies with the word limit set forth in Local Rule 11-6.1.

Dated: October 2, 2026

Respectfully submitted,

By: *<u>/s/ Noah Heinz</u>*
Noah Heinz
Albert Pak
PAK HEINZ PLLC
20 F Street N.W., 7th Floor
Washington, D.C. 20001
Tel.: (202) 505-6354
Email: noah.heinz@pakheinz.com
Email: albert.pak@pakheinz.com
*Counsel for Plaintiffs*